IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

UNITED STATES OF AMERICA

v.

KAITLYN MARIE HAMMOND,

*Defendant*.

Case No. 1:24-mj-00033

## UNITED STATES' OPPOSITION TO DEFENDANT'S BRIEF IN SUPPORT OF HER MOTION FOR REVIEW AND REVOCATION OF DETENTION ORDER

The United States hereby responds to the defendant's brief in support of her motion for review and revocation of the detention order issued by the Honorable Judge Ivan D. Davis on February 8, 2024.  *See* ECF Nos. 20 (Motion), 30 (Brief in Support, hereinafter "Def. Brief").  In support of the defendant's continued detention, the United States submits the following:

### I.    FACTUAL AND PROCEDURAL BACKGROUND

The criminal complaint in the above-captioned case charges defendant Kaitlyn Marie Hammond in Count One with being involved in a conspiracy to distribute 400 grams or more of a mixture and substance containing fentanyl, in violation of Title 21, United States Code, Sections 841(a)(1) and 846.  This offense carries a mandatory minimum sentence of 10 years' imprisonment.  In addition, the defendant is charged in Count Two with possessing a firearm during and in relation to a drug trafficking offense, in violation of Title 18, United States Code, Section 924(c).  This offense carries a sentence of five years' imprisonment to be served consecutively to any other sentenced imposed.  Each of these charges, standing alone, triggers a presumption, subject to rebuttal by the defendant, that no condition or combination of conditions

1

will reasonably assure the appearance of the person as required and the safety of the community. *See* 18 U.S.C. §§ 3142€(3)(A) and (B).

The indictment is based on an investigation into a drug distribution conspiracy through which tens of thousands of deadly fentanyl-laced counterfeit oxycodone pills, kilograms of fentanyl powder, and kilograms of cocaine were brought into this district by the defendant and her coconspirators. The defendant, her husband Carrington Hammond ("C. Hammond")), and their co-conspirator Mohamed Haddou ("Haddou") were the highest-level distributors identified operating in this district. The three had direct contacts with sources of supply operating out of the Phoenix, Arizona area. Those Arizona-based sources of supply, including Aaron Mitchell ("Mitchell")[1] and Iram Leyva ("Leyva"), distributed to the defendant and others by shipping packages each containing tens of thousands of counterfeit oxycodone pills and/or kilogram quantities of cocaine. Locally, the defendant, C. Hammond, and Haddou in turn each personally distributed their drugs into this district—both on the street directly to users, but also in thousand and multi-thousand pill quantities to redistributors who spread the pills further within the community.

The counterfeit oxycodone pills were in the form of small round blue pills imprinted with an "M" and a "30," the most prolific form of fentanyl seen by law enforcement in this region in recent years. Just one package personally received by the defendant for redistribution through this district contained over 50,000 counterfeit oxycodone pills containing fentanyl. The investigation identified numerous additional packages shipped by the defendant's coconspirators that contained narcotics.

---

[1] The conspiracy may be familiar to the Court, as this Court previously ordered the defendant's co-conspirator Aaron Mitchell detained following the United States motion for review of a release order following his August 10, 2023 arrest. *See* Mem. Op. and Order, *United States v. Mitchell*, Case No. 1:23-mj-00157 (ECF No. 27).

The defendant and her husband C. Hammond distributed their deadly wares while also armed with deadly weapons.  This dangerous combination of guns and drugs was made possible by the defendant, who had obtained a concealed carry permit in the state of Virginia.  As she later told a friend, this permit allowed the purchase of "as many [guns] as you want."  Thereafter, during a one-month span in the summer of 2022, as her transnational drug distribution conspiracy was getting started, the defendant purchased at least eight firearms.  Some she maintained for personal use in furtherance of her and her husband's drug-trafficking.  Others have since been recovered by law enforcement in connection with criminal activity or from individuals prohibited from possessing the firearms.

During the course of the conspiracy, the defendant lived in a two-bedroom apartment in Alexandria, Virginia together with her husband, Carrington Hammond, as well as their co-conspirator, Mohamed Haddou. The defendant and her co-conspirators stored and distributed fentanyl, cocaine, and firearms out of this residence.  Drugs and proceeds were stored within safes. Firearms, however, were kept easily accessible in multiple places within arm's reach and loaded.

Initial arrests were made against three members of the conspiracy in and around March 2023.  The defendant and her conspirators thereafter continued the conspiracy undeterred for several months, until its activities were largely halted by a second round of charges against another four of the defendant's co-conspirators in August 2023.  Surrounding these arrests, on August 10, 2023, the defendant's apartment was searched.  The search began at approximately 6:04 AM.  In the residence at that time were the defendant, Aaron Mitchell, Mohamed Haddou, and an uncharged individual referred to herein as "W-1."  Found within the residence were the following: over 44,000 counterfeit pills containing fentanyl, paraflurofentanyl, and xylazine; over 1.7 kilograms powder fentanyl; and two firearms.  The two firearms found in the apartment had been purchased by and belonged to the defendant.  One was found hidden under a sofa cushion where

co-conspirator Mitchell had been sleeping.   Another was found in co-conspirator Haddou's bedroom closet, within reaching distance of a duffel bag and a safe both of which were filled with fentanyl in pill and powder form.   At the time of the search, the defendant claimed ownership of the firearms.

The defendant was charged by criminal complaint on February 1, 2024, and was arrested the following day.   At the time of her arrest, the defendant told law enforcement that she would have traveled to an un-extraditable country if she had known she was being arrested.

The defendant made her initial appearance in this district on February 5, 2024, at which time the government moved for detention.   Attorney John Iweanoge was appointed to represent the defendant.   A preliminary and detention hearing was originally set for February 7, 2024, but was continued at the request of the defendant.   A detention hearing was then held on February 8, 2024, before Magistrate Judge Ivan D. Davis.   At the time of the detention hearing, the defendant proffered the identity of a third-party custodian, but pretrial services had not been given sufficient time to assess the suitability of the third-party custodian, Jessica Harrison.   The government's motion was granted, and the defendant was detained pending further proceedings.

`On February 15, 2024, the defendant moved for review of Judge Davis's detention order. The Honorable District Judge Rossie D. Alston was assigned for purposes of the review. Following order of the Court setting a briefing schedule, ECF No. 28, the defendant submitted briefing on her motion on February 27, 2024.   The United States hereby files its response.   Because no condition or combination of conditions will reasonably assure the defendant's appearance and the safety of the community, Judge Davis's detention order should be affirmed.

## II.    STANDARD OF REVIEW

18 U.S.C. § 3145 allows this Court to review a magistrate judge's release order.   On review, the district judge acts *de novo* and makes an independent determination of the proper pretrial

detention or conditions for release based on evidence presented to the magistrate judge and on additional evidence adduced before the district judge. *See United States v. Clark*, 865 F.2d 1433, 1436 (4th Cir. 1989); *see also United States v. Fortna*, 769 F.2d 243 (5th Cir. 1985).

Because the defendant is charged with both (1) an offense that carries a ten-year mandatory sentence under the Controlled Substances Act, and (2) a violation of 18 U.S.C. § 924(c), a presumption in favor of detention arises. 18 U.S.C. §§ 3142(e)(3)(A) and (b). Once triggered, the presumption imposes a limited burden of production on the defendant to come forward with some evidence that she does not pose a danger to the community or risk of flight. *See, e.g.*, *United States v. Reuben*, 974 F.2d 580, 586, (5th Cir. 1992), *cert. denied*, 507 U.S. 940 (1993); *United States v. Khusanov*, 731 F. App'x 19, 21 (2d Cir. 2018). If the defendant meets this burden of production, the burden shifts back to the government and the government need only prove either:

a. The defendant's risk of flight by a preponderance of the evidence, *see United States v. Stewart*, 19 F. App'x 46, 48 (4th Cir. 2001); or

b. The risk of harm to any person or the community by clear and convincing evidence, *see* 18 U.S.C. § 3142(f)(2)(B).

"For pretrial detention to be imposed on a defendant, the lack of reasonable assurance of either the defendant's appearance or the safety of others or the community, is sufficient; both are not required." *Stewart*, 19 F. App'x at 48.

In determining whether there are conditions of release that will reasonably assure the defendant's appearance as required and that will protect the safety of the community, the Court must consider four factors: (1) "the nature and circumstances of the offense charged," including whether the offense is a "crime of violence"; (2) "the weight of the evidence against" the defendant; (3) "the history and characteristics of" the defendant, including the defendant's physical and mental condition; and (4) "the nature and seriousness of the danger to any person or the community that would be posed by" the defendant's release. 18 U.S.C. § 3142(g)(1)-(4).

After the issuance of a detention order, the court may permit that a defendant be temporarily released to the extent such release is necessary for preparation of the person's defense or for other compelling reasons.  18 U.S.C. § 3142(i).  The defendant bears the burden of demonstrating a compelling reason.  *See United States v. Clark*¸448 F. Supp. 3d 1152 (D. Kan. Mar. 25, 2020).  Outside the context of the need to consult with counsel, "most of the opinions granting temporary release have done so where the defendant demonstrated a terminal illness or particularly severe medical condition that could not be adequately treated within the correctional system."  *United States v. Creek*, 457 F. Supp. 3d 473, 476 (D. Md. 2020) (collecting cases).  There are no Fourth Circuit cases, to government counsel's knowledge, analyzing Section 3142(i) outside of the context of the COVID-19 pandemic.  *United States v. Creek*, 457 F. Supp. 3d 473, 474 (D. Md. 2020) (citing Fourth Circuit's order of remand); *see also United States v. Chase*, CR JKB-19-0473, 2020 WL 2319132, at *3 (D. Md. May 11, 2020).

"Detention hearings are an informal proceeding, and the evidence presented is not governed by the Federal Rules of Evidence."  *United States v. Duncan*, 897 F. Supp. 688, 690 (N.D.N.Y. 1988); 18 U.S.C. § 3142(f)(2).  The government may proceed in a detention hearing by way of proffer.  *United States v. Smith*, 79 F.3d 1208, 1209–10 (D.C.Cir.1996) (per curiam) (citing *United States v. Gaviria*, 828 F.2d 667, 669 (11th Cir. 1987); *United States v. Martir*, 782 F.2d 1141, 1145 (2d Cir. 1986); *United States v. Winsor*, 785 F.2d 755, 756 (9th Cir. 1986); *United States v. Acevedo-Ramos*, 755 F.2d 203, 206–07 (1st Cir. 1985)).

## III.   ARGUMENT

The United States submits that the defendant has not overcome the presumption, and even assuming that she had, the risk of flight and danger to the community in this case weigh strongly in favor of detention.  By all appearances, the defendant has, for years, lived her life as if she were above the law.  She did so despite law enforcement's near-constant presence in her life through

attempts to stem the flow of drugs and firearms that entered the community through her and her conspirators' conduct.  There is no set of conditions that can guarantee the community's safety. Each of the factors set forth in 18 U.S.C. § 3142 favor detention.  Further, to the extent the defendant posits there are compelling reasons justifying temporary release pursuant to 18 U.S.C. § 3142(i), the defendant has not met her burden to establish such compelling reasons, and regardless, the government is aware of none.

> ### i.   The Defendant Has Not Overcome the Presumption

The defendant has not and cannot overcome the presumption in this case.  As an initial matter, the defendant's brief fails to recognize the presumption *at all* in articulating the legal standard.  Instead, the defendant repeatedly cites inapposite cases that analyze circumstances in cases involving a presumption favoring release.  *See* Def. Brief. at 5.  There is no question that this is a presumption case and any reference to the contrary is misplaced.

In arguing that she has overcome the presumption, the defendant posits:

(1) that the Magistrate Judge erroneously did not consider the Pre-Trial Services Agency recommendation that rebuts the presumption of dangerousness and protects the community;
(2) the availability of home detention and location monitoring; and
(3) the defendant's continued presence in this district despite the arrests of co-conspirators.

Def. Br. at 9, 2, and 6.

As an initial matter, based on the undersigned counsel's recollection, the defendant is incorrect that the magistrate judge did not consider pre-trial services recommendation.[2]  Further, the probation officer did not have in its possession or consider in its assessment the information presented to Judge Davis and to this Court that weighs strongly in favor of detention.  That

---

[2] The United States of course defers to the record of the transcript of the proceedings, which the defendant has not ordered or provided in support of her motion.

probation's assessment is therefore independent of, and in fact divorced from, many of the facts underscoring the § 3142(g) factors that the Court must consider, Pre-Trial Services' original recommendation of release in this case has limited value.  Further, probation does not consider the presumption in making its recommendations, and therefore while the Court may certainly take probation's findings into account in making a ruling, the recommendation of release by pretrial, standing alone, as found by Judge Davis, does not rebut the presumption of dangerousness.

The defendant further points to GPS monitoring and a curfew as sufficient to overcome the presumption and mitigate the defendant's dangerousness and risk of flight.  That is not so.  As this Court recognized in detaining one of the defendant's co-conspirators, Aaron Mitchell, "the suggested conditions of release do not ameliorate the danger that Defendant will continue trafficking drugs.  This is especially true where Defendant's role in the alleged drug conspiracy was facilitated primarily by the U.S. mail and electronic means."  *See* Mem. Op. and Order at 5, *United States v. Mitchell*, Case No. 1:23-mj-00157 (ECF No. 27) (citing *United States v. Elliott*, 546 F. Supp. 2d 643, 645 (S.D. Ind. 2008) (noting that "travel restrictions or a curfew would be meaningless in the face of a telecommunications network with associates that allows drug trafficking to continue from remote locations")).  As to flight, as this Court and others have recognized "location monitoring only reduces a defendant's 'head start should a defendant decide to flee' because the ankle monitor can be removed."  *United States v. Mitchell*, Case No. 1:23-mj-00157 (ECF No. 27) (citing *United States v. Wang*, No. 23 CR. 118-3 (AT), 2023 WL 4551637, at *3 (S.D.N.Y. July 14, 2023)).  As such, location monitoring merely provides notice of, and does little to prevent, flight and will do little to protect the community from the defendant's continued criminal conduct.  The defendant further points to the release of co-conspirator Mohamed Haddou as "similarly situated" and an individual "who [was] charged with more serious crimes facing longer periods of incarceration."  For some time, the defendant and Haddou had similar roles in

the drug transactions in furtherance of the charged conspiracy, but it is, in fact, *this defendant* who is charged with more serious crimes.  Haddou was not charged with a violation of 924(c).  Haddou did not traffic in firearms.  The defendant faces a mandatory minimum sentence 5 years longer than that faced by defendant Haddou.  He is therefore not similarly situated, as Judge Davis correctly found.

Lastly, though defendant is correct to point out that the defendant has stayed in this district throughout the pendency of her conspirators' federal cases, this is no mitigating factor.  Instead, the government would submit that the evidence in this case and the history of the defendant reveal her long-held belief that she was above the law.  As articulated in Section III(iv) below, the defendant and her husband together have had a near-constant presence of law enforcement in their lives for the past several years.  Nevertheless, the two both continued various criminal schemes, which ultimately escalated in dangerousness and complexity to the offenses at hand.  Further, instead of avoiding prosecution through simply ceasing all criminal conduct after her conspirators were charged, the defendant instead chose to reach out to and threaten a potential witness in the government's case.  Therefore, her continued presence is not representative of substantial lessening of danger to the community.  As to flight, the government submits that the defendant simply believed she continued to be above the law and would never be charged.  This is demonstrated by:

1. the fact that the defendant contacted law enforcement after the arrests to demand the return of her seized device;
2. the fact that the defendant made a claim with the DEA challenging administrative forfeiture of cash and jewelry seized from her residence in the August 10, 2023, search; and
3. the defendant's statements to agents at the time of the arrest that she would have traveled to an un-extraditable country if she knew she was being arrested.

If the defendant truly anticipated potential arrest in the instant case, none of these events would have occurred.  Further, as Judge Davis correctly noted at the defendant's detention hearing on

February 8, her statement to authorities at the time of arrest was a clear statement against penal interest at the time which therefore carries with it extra indicia of reliability as to the truthfulness of the defendant's assertion. *See, e.g.*, Fed. R. Evid. 804(b)(3).[3]

### ii. Nature and Circumstances of the Offense Charged

Here, the defendant is charged with two very serious offenses, namely a conspiracy to distribute 400 grams or more of a substance containing fentanyl and possessing a firearm during and in relation to that offense. If convicted, the defendant is subject to a 15-year mandatory minimum sentence. Under similar circumstances, judges within this District have found "the penalties at stake in this case provide a strong incentive to flee." *United States v. Maitland*, 2020 WL 1929133 (E.D. Va. Apr. 21, 2020). Despite her numerous interactions with convicted felons, the defendant now stands for the first time in her life facing a lengthy prison sentence. The reality of that eventuality has been made clear to the defendant since, only a week ago, the defendant's husband was sentenced to a 15-year prison term for his participation in the same conspiracy. *See United States v. Hammond*, Case No. 1:24-cr- 166 (E.D. Va. Feb. 20, 2024). There is therefore a strong incentive to flee.

No judge in this country need be reminded of the dangerousness of the controlled substance offense at issue in this case. "Fentanyl is killing Americans at an unprecedented rate," said DEA Administrator Anne Milgram. Fatal overdose has been the leading method of unnatural death in Virginia since 2013.[4] Opioids, and specifically illicit fentanyl, has been the driving force behind the large increase in fatal overdoses, contributing to approximately 76% of all fatal overdoses in

---

[3] Regardless of the applicability of this hearsay rule, the statement is of course a defendant statement and is therefore admissible against her on that basis. Fed. R. Evid 801(d)(2)(a).

[4] https://www.vdh.virginia.gov/content/uploads/sites/18/2024/01/Quarterly-Drug-Death-Report-FINAL-Q3-2023.pdf (last visited February 27, 2024) ("the VDH Report").

Virginia in 2022.  *Id.*  The most common combination of substances causing fatal overdoses in Virginia in 2022 was cocaine and fentanyl—the precise drugs that the defendant and her conspirators poured into this community that same year.  The defendant's distribution of these deadly drugs displays a disregard for human life that threatened significant harm to this community.

Moreover, the types of drugs that the defendant sold have had a deadly impact on communities near and far.  The counterfeit oxycodone pills are being mass produced by cartels in Mexico, and then facilitated through the cartels into the United States for distribution.  These counterfeit pressed pills are incredibly dangerous because they are made to look like real prescription pills, but there is no way to know that they instead contain fentanyl (and other dangerous opioids like paraflurofentanyl and xylazine).  And because producing illicit fentanyl is not an exact science, there is no way for users to know how much fentanyl is in each pill.  42% of these counterfeit pills tested by the DEA across its cases have been found to contain a potentially lethal dose.[5]  At least one of the defendant's redistributors for a time believe that the pills were true oxycodone.  In reality, there were much deadlier.

The powder fentanyl that the conspiracy also distributed bears unique risks.  Possible inhalation of airborne, highly potent powder presents an extreme safety risk to sellers, buyers, and first responders alike, such that first responders are now instructed to wear respirator protection, safety goggles, nitrile gloves, and "wrist/arm protection" when responding to overdose scenes.[6]

---

[5] https://www.dea.gov/resources/facts-about-fentanyl (last visited February 27, 2024).

[6] See National Institute for Occupational Safety and Health (NIOSH), Preventing Emergency Responders' Exposure to Illicit Drugs, available at https://www.cdc.gov/niosh/topics/fentanyl/risk.html  (last viewed February 27, 2024).

The risks of harm to the community ever-present in drug cases are further exacerbated when guns are added to the equation.

### iii.    Weight of the Evidence

The weight of the evidence is quite strong and increases the risk of flight.  The defendant has been charged following the conviction of seven co-conspirators to date at the federal and state levels.  *See, e.g.*, *United States v. Hammond*, Case No. 1:23-cr-166 (LMB) (E.D. Va.); *United States v. Haddou*, Case No. 1:23-cr-169 (LMB) (E.D. Va.); *United States v. Mitchell*, Case No. 1:23-cr-175 (LMB) (E.D. Va.); *United States v. Moore*, Case No. 1:23-cr-177 (LMB) (E.D. Va.); *United States v. Rivera Molina*, Case No. 1:23-cr-129 (LMB) (E.D. Va.).

The evidence against the defendant includes testimonial and documentary evidence.  The documentary evidence alone is incredibly strong.   In the course of the investigation, the government seized numerous devices, including those in the possession of the defendant, her husband, as well as her coconspirators Mitchell, Leyva, Haddou, and others.  The documentary evidence paints a picture of the defendant's role in the conspiracy.  Financial accounts show tens of thousands of dollars paid to the defendant, generally designed a "gift," a term the defendant instructed her customers to use for drug payments. During the course of the conspiracy, the defendant was frequently in group messages that contained her, her husband, and their conspirators.  *See e.g.,* Government Detention Exhibit 1;[7] Government Detention Exhibit 2 (communications with convicted co-conspirator Ja'Qua Moore).  Further, the defendant's text message communications shed light on the elevated role that the defendant enjoyed in the drug-distributing aspect of the conspiracy after her husband self-surrendered to serve a lengthy term of

---

[7] The United States cites herein to exhibits which it intends to offer for admission in the record at the hearing scheduled for February 28, 2023.  As a courtesy, advance copies of those exhibits will be provided via email to defense counsel and the Court.

prison, leaving the conspiracy ongoing in his absence.  For example, as reflected in paragraphs 45–52 of the affidavit in support of the criminal complaint in this matter (ECF No. 2), in late July 2023 the defendant coordinated the shipment (with co-conspirator Mitchell) and delivery (to co-conspirator Moore) of a package containing 50,000 counterfeit pills, as well as the collection of proceeds form an uncharged coconspirator.  Days later on August 2, 2024, it was the defendant who informed co-conspirator Haddou that one of their sources of supply, Mitchell, would be visiting from Arizona.  In that communication, the defendant informed Haddou that another safe would be needed in their shared apartment (because it was full of either drugs or proceeds, depending on which safe she was referring to); and directed Haddou what amount and how to pay Mitchell.  *See* Government Detention Exhibit 3 (communications with convicted co-conspirator Mohamed Haddou).  Beyond the damning documentary evidence, the government has multiple witnesses who would testify to their participation in drug transactions with the defendant as well as her participation in and knowledge of the conspiracy throughout its course.  *See, e.g.*, Affidavit ¶ 26(b).

The evidence regarding the defendant's procurement and possession of firearms in furtherance of the conspiracy is similarly strong and goes well beyond the single 924(c) charge of the criminal complaint.  As an initial matter, the defendant has admitted in a voluntary and recorded interview that the two firearms seized from her apartment on August 10, 2023, belonged to her.  The interview occurred that same day as the search.  The CZ Scorpion 9mm firearm underlying the defendant's current 924(c) charge was found bearing a drum magazine, with one round in the chamber, and within reaching distance of a duffel bag and safe filled with fentanyl.

Moreover, the government's evidence has revealed that the defendant did not simply possess firearms, she trafficked in them.  The defendant had a controlled carry permit beginning as early as 2020.  It appears that it was not until 2022; however, that the defendant began procuring

13

firearms for her conspirators, including for her husband who was a convicted felon and prohibited from purchasing firearms himself.  The defendant's husband, apparently out of excitement for this opportunity, detailed his and the defendant's intentions on numerous occasions with third parties.  For example, in April 2022, the defendant's husband wrote in a message to a third party "Kate will be strapped by June."  He later added "she don't play either. Might shoot before me lls. When you white you can shoot first and ask questions never."   Government Detention Exhibit 4 (communications between C. Hammond, the defendant, and an uncharged third party).  In June 2022, after borrowing a firearm from co-conspirator and convicted felon Moore, the defendant's husband promised "you can get it back soon as Kate buy me something…she can buy starting the 11th."  Government Detention Exhibit 2.  The defendant was a participant in this text message chain as well.  On June 12th in the same conversation, the defendant's husband wrote "we boutta go to gun store."  *Id.*  After procuring funds took longer than expected, on the 17th the defendant's husband responded to Moore's question as to whether he had gotten his "new fishing pole" that "my wife getting me one tmro…her application just got approved."[8]  *Id.*  And in response to the question of what kind of "fishing pole" he would get, the defendant's husband eliminated any uncertainty as to the topic of discussion, specifying a "glock 30 SF."  The defendant purchased at least three firearms manufactured by Glock Inc. within a month of this communication.

But the defendant did not just buy firearms for her husband's use.  Documentation of the defendant's firearm purchases collected by agents of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") demonstrate a spree of illicit firearm purchases by the defendant in the summer of 2022.  Provided as Government Detention Exhibit 6A through 6E are ATF Form 4473's

---

[8] The intervening discussion in Government Detention Exhibit 5, in which Moore and Hammond discuss a potential act of violence towards the arresting officer in Hammond case, is of further serious concern to the government, particularly given that the defendant was also copied on this text message thread.

and receipts documenting the defendant's purchase of eight firearms within a one-month period in the summer of 2022.  Multiple of those firearms have since been recovered by law enforcement from others in unrelated encounters, one occurring just 10 days after the firearm was purchase by the defendant.  *See* Government Detention Exhibit 7A through 7E.  This documentary evidence is strong evidence of the defendant's intent to and actual trafficking in firearms. As with the drug distribution charge, the defendant's possession, use, and trafficking in firearms in relation to drug trafficking is supported by witnesses.  *See, e.g.*, Affidavit ¶ 26(c).  Thus, the government has strong evidence of the defendant's role in the drug-trafficking conspiracy and firearm possession in relation thereto.

This evidence of the defendant's role is combined with the evidence of the conspiracy overall, which includes a significant amount of information gathered through surveillance, controlled purchases of drugs and a firearm, data from the U.S. Postal Service, seized packages containing lab-confirmed fentanyl, numerous seized devices, confidential informants, cooperating defendants, and other witnesses.  This evidence of the general conspiracy further supports a risk of flight.  *See United States v. Berkun*, 392 F. App'x 901,903 (2d Cir. 2010) (noting that when "the evidence of guilt is strong, it provides" a defendant "with an incentive to flee").

    **iv.**    **History and Characteristics of the Defendant**

Beyond the conduct at issue in this case, the defendant's history demonstrates (1) a marked failure to be deterred by law enforcement; (2) her involvement of immediate family members in her criminal activity; and (3) a lack of candor to probation departments in a number of jurisdictions. The government submits that these three factors, taken together, make it unlikely that any combination of conditions would be sufficient to protect the community from further crimes of the defendant.

### a.   Continued Criminality Despite Law Enforcement Intervention

To her credit, the defendant has a significantly shorter criminal record than the peers she chose to surround herself and, in the case of her husband,[9] undertake a lifelong commitment to. Nevertheless, the defendant's actions in response to her and her husband's law enforcement encounters demonstrate a lack of respect for law enforcement and danger to the community that has persisted through the years.

The seeds of the conspiracy in this case were likely planted within prison walls during Carrington Hammond's (the defendant's husband) last term of incarceration, where he met co-conspirator Mohamed Haddou.  Kaitlyn Hammond visited and spoke to her husband during his term of incarceration.  It was after each of their releases that the three moved in together and began distributing firearms, fentanyl, and cocaine out of their shared residence.

While the defendant's husband was still incarcerated in Fairfax, Virginia, the defendant was arrested in Dover, Delaware in June of 2021 after a vehicle stop revealed marijuana and a concealed firearm within the defendant's purse.  The defendant's Virginia concealed carry permit of course did not authorize her to conceal a firearm in Delaware.  Local press covered the incident. The defendant sent the link of the coverage to her sister and now-proposed third-party custodian, adding that her father "CAN NOT FIND OUT ABOUT THIS."  Government Detention Exhibit 8 (communications between the defendant and J. Harrison);  *see   also* https://www.wmdt.com/2021/06/police-handgun-drugs-found-during-traffic-stop-in-dover/. Days later and while felony charges were still pending in Delaware, the defendant attempted to

---

[9] By means of contrast, the defendant's husband, Carrington Hammond, was assessed a criminal history score of 18 by probation and Judge Brinkema at his sentencing, giving him the highest criminal history category (VI) available under the Sentencing Guidelines.  *See* Judgment, *United States v. Hammond*, Case No. 1:23-cr-166, ECF No. 55 (E.D. Va. Feb. 13, 2024).

buy another firearm to replace the one that had been seized by law enforcement.  *See* Government Detention Exhibit 8 ("well I guess I can't buy a gun. I got denied…because of my case.").

Once the defendant's husband was released from incarceration and not long before the instant conspiracy went into full force, the defendant's husband was again arrested in May 2022, this time on 14 gun and drug-related charges in Prince George's County, Maryland.  The defendant's husband was released on bond and, within days, actively began reengaging in drug distribution—including through group text messages with his wife (the defendant), following along the chain of events.  Government Detention Exhibit 1.  As the defendant's husband told co-conspirator Moore around this time, "I wake up everyday prepared to do a life sentence."  It was during the following month, June 2022, that the defendant bought guns *en masse* from dealers in Virginia for her husband and others, as recounted *supra*.

If none of the above served as a wakeup call for the defendant to cut ties with her criminal associates and stop her own participation in drug- and gun-related offenses, her final opportunity was in late July 2023 when her husband self-surrendered to begin a three-year prison term for his charges in Prince George's County.  Instead, as the defendant and her husband planned his self-surrender, they planned for the future of their narcotics enterprise.  The defendant largely took over her husband's leadership role and began directly communicating with co-conspirator Mitchell regarding the shipment of narcotics, and with co-conspirator Moore to coordinate his receipt of drug-laden packages and in-person delivery to her.  ECF No. 2 at ¶ 45–52.

Lastly, even after many of the defendant's criminal associates entered federal custody on charges relating to the instant conspiracy, the defendant failed to meaningfully alter her behavior.  The defendant kept close communication with her husband while he was in the U.S. Marshals Custody, including many conversations, both via telephone and written messages, over the Alexandria Detention Center's secure messaging system.  In these messages, the defendant sent

photographic reminders of the conspiracy's successes, including photographs of the defendant and her husband counting large sums of cash and wearing jewelry bought with criminal proceeds. *See* Government Detention Exhibit 9 (photographs transmitted by the defendant over the jail communication system).

What is perhaps of most concern to the United States is a threatening communication transmitted by the defendant to a potential witness in this case. First, in a recorded jail call in September 2023, the defendant's husband instructed her to find out who was cooperating. Thereafter, according to an uncharged witness, the defendant made a phone call conveying a threat using words to the effect of: "tell [charged codefendant] to keep my name out of his mouth." The witness understood this command to have been in relation to the defendant's belief that the referenced charged codefendant was cooperating with law enforcement. This witness felt threatened by the defendant's conduct.

In considering detention, "the court must, in essence, make a prediction as to whether defendant is likely to traffic in illicit drugs if released pending trial based on, *inter alia,* the factors prescribed by the Bail Reform Act." *United States v. Gibson,* 481 F. Supp. 2d 419,423 (W.D. Pa. 2007). The government submits that the defendant's history shows an unwillingness to change her criminal behaviors.

### b. Involvement of Family Members in the Offense Conduct

The government further has concerns regarding the defendant's sister's ability to fulfill her duties as a third-party custodian in light of the defendant's prior success in taking advantage of family in furtherance of her criminal activity, and her sister's prior involvement in the offenses.

For example, during the conspiracy the defendant used her parent's address for receipt of at least one drug-laden parcel. Specifically, on January 28, 2023, U.S. Postal Data shows that a suspected drug-laden package was transmitted from Phoenix, Arizona, to the defendant's mother's

house.   At the time, the defendant was living in Alexandria in her shared apartment with C. Hammond and Haddou.  Text messages from that date show the defendant's mother reaching out to her about the package, and the defendant indicating that her husband, C. Hammond, would pick it up.  The defendant's mother than demanded that the two no longer send packages to her home.  Later, in March 2023, the defendant asked her mother to fill out her renewed conceal carry permit for her.

The government has concerns with the proposed third-party custodian in particular given her involvement in the defendant's procurement of firearms.  According to text messages between the two, the defendant's third-party custodian also has a concealed carry permit.  Further, the defendant's phone contains numerous messages with another third party "Mike," who appears to be of close personal relation, and perhaps have lived with, the third-party custodian.  *See* Government Detention Exhibit 10; Government Detention Exhibit 11.  In these messages, the defendant on multiple occasions attempted to buy firearms from Mike, asking in March 2021 "you want to sell your ar9" and later in June 2022 (the same month the defendant bought eight firearms from other sources) "hey, you got any guns you want to sell?"  *Id.*  There appear to also be some limited drug-related conversations in a group message between the defendant, her sister (the proposed third-party custodian), and Mike.  *See* Government Detention Exhibit 11.  Now that Pretrial Services has had the opportunity to assess the suitability of the defendant's proposed third-party custodian,[10] it shares in the government's concerns.  *See* ECF No. 31.

---

[10] On the morning of February 7, 2023 the government shared with defense counsel its concerns over the defendant's initial proposed third-party custodian, who had prior drug-related convictions.  It was not until 45 minutes before the February 8, 2023 hearing that defense counsel provided Pretrial Services with the identity of a new third-party custodian, the defendant's sister Jessica Harrison.  An assessment of that third-party custodian was therefore not completed until after the defendant provided contact information for the custodian to probation, which the government understands did not occur until the week of February 26, 2024.

In addition to the proposed third-party custodian's involvement in the offense conduct, the government has concerns as to whether the defendant's moral suasion[11] is such that she would deter, rather than assist, in the defendant's violation of release conditions.  For example, evidence in communications between the two indicate that the defendant's sister assisted the defendant in fraudulently obtaining a job in July of 2022.  *See* Government Detention Exhibit 8.  Specifically, it appears the defendant falsely listed her proposed third-party custodian as a job reference, indicating that she had been a supervisor. The defendant wrote to her sister at the time:

> Just say we worked together to ensure everyone was trained properly. I am attentive to detail. Shes calling you in the am. For the job. If anything just call me and ill mute myself and tell you what to say.

*Id.*

While it is certainly laudable that the defendant's sister would agree to serve as a third-party custodian, the government is concerned that the defendant's sister could adequately fulfill her duties in light of the defendant's prior influences over her.

### c.  Lack of Candor to Probation Departments

Lastly, regardless of the suitability of any third-party custodian, the government submits that the defendant has a history in this case and others of false statements to probation departments in order to falsely obtain more desirable release conditions.  This conduct, on its own, suggests that no combination of release conditions could adequately protect the public.

For example, in February 2022, it appears the defendant may have assisted in providing false residential information to her husband's probation officer.  Specifically, the defendant's

---

[11] Courts have used this term to describe a bond co-signer's duty to provide "moral…assurance ... of the defendant's appearance in Court when required."  *United States v. Melville*, 309 F. Supp. 824, 826-27 (S.D.N.Y. 1970).  Factors relevant to considering whether a bond co-signer has moral suasion may include the strength of the tie between the suretor and the defendant, the defendant's roots in the community, and the regularity of contact between the suretor and the defendant.  *United States v. Batista*, 163 F. Supp.2d 222, 224 (S.D.N.Y. 2001).

mother sent her a text message in relation to her husband's recent release from state custody: "why did free [C. Hammond] tell his PO officer that he has been living here and that this is his address and has been for two weeks?"  The defendant did not response in substance.

In May 2022, it appears that the defendant assisted in providing the probation officer for her husband (who used the alias "Free") with a false employment record.  Specifically, the following conversation occurred between the defendant and co-conspirator Moore:

| | |
|---|---|
| **Defendant** | Free have [sic] pretrial your number<br>He said he was working 6 months to s [sic] year |
| **Moore** | That's A Bet<br>…. |
| **Defendant** | They just called me to verify that hes coming to my address they might call you to verify employment |

And lastly, it is of concern to the United States that the defendant appears to have continued this lack of candor in her communications with Pretrial Services in this District.  For example, according to the initial pretrial services report, the defendant conveyed that she previously owned two handguns which were seized by agents in August 2023.  This leaves at least six firearms that the defendant purchased unaccounted for.  The defendant's account further provides no explanation for the speed loader, magazines, and rounds of ammunition that were seized from the defendant's car on the day of her arrest just weeks ago, many months after the only two firearms she claimed she owned had been seized.

### v.    Additional Claims of Relief Raised by the Defendant

The defendant's brief further raises claims under 18 U.S.C. § 3142(i), as well as the Fifth, Sixth, and Eight Amendments to the United States Constitution.  Def. Br. at 1, 4.  Having already had a detention hearing three weeks ago and having filed a motion for review of the hearing two

weeks ago,[12] it was not until within 24 hours of the hearing—and after the Court ordered the defendant to file a brief in support of her motion as required by local rules—that these arguments were raised.  Regardless of the timeliness of these claims, they are without merit.

In support of defendant's claims, she notes that resolution of cases often take "many months" and therefore may result in a due process violation in her case.  Def. Br. at 8.  The defendant has at this point been detained for under one month, well within the provision of the Speedy Trial Act.  Further, given the weight of the evidence in favor of detention and the lengthy prison sentence that the defendant faces if convicted, there is no punitive aspect to detention in this case.  As it relates to temporary release under 18 U.S.C. § 3142(i), the defendant suggests in her motion that such release is merited "for preparation of her defense and/or for another compelling reason that will be posited at a hearing on this motion."  Def. Br. At 10.  There are no compelling circumstances relating to discovery or the preparation of a defense in this case that will make review of the evidence any more difficult than for other defendants detained pretrial in this district, including the defendant's co-conspirators.

## CONCLUSION

The defendant's history has proven that no conditions or threat of imprisonment will suffice to curtail the defendant's criminal conduct.  Now, facing a 15-year mandatory minimum sentence and Sentencing Guidelines likely higher[13] and with her husband already sentenced to a 15-year

---

[12] It is worth noting simply for the record, that the approximate two-week delay between the defendant's motion and the setting of a hearing appears to be with the consent of the defendant.  The government contacted defense counsel on February 16, February 21, February 22, and February 23 to coordinate regarding the timing for a hearing date.  Defense counsel was receptive and indicated that the delay in noticing a hearing was simply due to coordination between the defendant and defense counsel's own schedule.

[13] The single, 50,000-pill package containing pressed oxycodone pills personally received by the defendant in July 2024 defendant and intercepted by law enforcement alone establishes a base offense level of 36—which without

term of imprisonment, the defendant has great incentive to flee from future appearances in this Court.  There further remains danger to the community by means of the defendant's unyielding drug and firearm distribution.  Defendant Kaitlyn Hammond cannot and has not rebutted the presumption that she should be detained pending trial, and even if the Court were to find the presumption rebutted, the factors set out in 18 U.S.C. § 3142(g) weigh in favor of detention. Accordingly, the United States respectfully urges this Court to affirm the order issued by United States Magistrate Judge Ivan Davis.

Respectfully submitted,

Jessica D. Aber
United States Attorney

By:      _____/s/_____
Heather D. Call
Kristin Starr
Assistant United State Attorneys

---

taking into account other factors yields a guidelines range of 188–235 months on Count One of the criminal complaint alone.