IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>KAITLYN MARIE HAMMOND,<br>a/k/a Kate<br><br>Defendant. | Case No. 1:24-CR-86 |

## STATEMENT OF FACTS

The United States and the defendant, Kaitlyn Marie Hammond, agree that the following facts are true and correct, and that had this matter proceeded to trial, the United States would have proven them beyond a reasonable doubt with admissible and credible evidence:

1. From at least in and around June 2022, and continuing thereafter up to and including in or around August of 2023, the exact dates being unknown, in Fairfax County, Virginia, within the Eastern District of Virginia, and elsewhere, the defendant did knowingly and intentionally combine, conspire, confederate, and agree with others, both known and unknown, to distribute:

   I. 400 grams or more of a mixture and substance containing a detectable amount of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide, commonly referred to as fentanyl, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A); and

   II. a mixture and substance containing five kilograms or more of cocaine, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C),

All in violation of Title 21, United States Code, Section 846.

1

2. Further, between at least in and around June 2022 through in and around August 2023, in Alexandria, Virginia, within the Eastern District of Virginia, and elsewhere, the defendant, knowingly and voluntarily conspired with others, including Carrington Hammond, to transfer firearms in or otherwise affecting commerce, knowing or having reasonable cause to believe that the use, carrying and possession of the firearm by the recipients would constitute a felony, in violation of Title 18, United States Code, Section 933(a)(1).

## I. The Drug-Trafficking Conspiracy

3. It was part of the drug-trafficking conspiracy that the defendant and co-conspirators, both known and unknown, would obtain pressed "M30," "30s," "Perc," or "Perks" counterfeit oxycodone pills containing fentanyl and distribute them in the Eastern District of Virginia and elsewhere for a profit. It was known by the members of the conspiracy, including the defendant, that the pills they were distributing were not legitimate prescription pills but were in fact counterfeit pressed pills that contained fentanyl. Part of the defendant's participation in the conspiracy involved distributing pills that contained a mixture and substance containing a detectable amount of N-phenyl-N-[1-( 2-phenylethyl )-4-piperidinyl] propanamide, commonly referred to as fentanyl, to drug customers.

4. The defendant worked closely with her husband, Carrington Hammond (C. Hammond") and Mohamed Haddou (hereinafter "Haddou") throughout this drug distribution conspiracy to obtain controlled substances for distribution, and the defendant, C. Hammond, and Haddou shared the profits of their joint distribution. The defendant utilized multiple CashApp accounts, among other means, to receive and send proceeds of the conspiracy. During a period of the conspiracy, the defendant, C. Hammond, and Haddou shared a residence. In addition to distributing kilogram quantities of fentanyl, the defendant, C. Hammond, and Haddou also distributed cocaine and other controlled substances.

2

5. During the course and in furtherance of this offense, the defendant personally distributed, or it was reasonably foreseeable to her that her co-conspirators distributed, at least 12 kilograms but not more than 36 kilograms of a mixture and substance containing a detectable amount of fentanyl.

    *a.    Obtaining Fentanyl from Sources of Supply*

6. The defendant and her co-conspirators obtained pressed fentanyl pills from sources of supply in the District of Arizona and elsewhere. Initially, C. Hammond was the primary point of contact with these sources of supply. C. Hammond often copied the defendant in group messages with redistributors and other co-conspirators, including Ja'Qua Moore ("Moore"), in which drug and firearm transactions were discussed. Upon C. Hammond or his co-conspirators placing an order, one of the defendant's suppliers, Aaron Alex Mitchell (hereinafter "Mitchell"), Iram Leyva ("Leyva"), and others, packaged and shipped fentanyl pills within parcels from Arizona through the mail (*i.e.*, United States Postal Service or "USPS"), or through private package delivery services, such as UPS and FedEx, to the defendant and/or her co-conspirators in the Eastern District of Virginia.

7. During the federal investigation into the defendant's drug trafficking, law enforcement identified at least 19 such packages mailed by Mitchell and Leyva to the defendant and her co-conspirators in the Eastern District of Virginia. Packages usually contained 10,000–20,000 counterfeit pills and 1–2 kilograms of cocaine. On average, Mitchell and his co-conspirators mailed between 10,000 and 40,000 counterfeit pills to the defendant, C. Hammond, and Haddou per month. On at least one occasion, the quantity exceeded these amounts.

8. During the course of the investigation, law enforcement intercepted multiple packages shipped by Mitchell and Leyva to the Eastern District of Virginia and elsewhere. For example, on or about April 12, 2023, Mitchell caused an uncharged co-conspirator (hereinafter

3

"UCC-1") to mail a parcel containing approximately 28,517 counterfeit pills containing fentanyl to an address in Sterling, Virginia, within the Eastern District of Virginia. Lab testing confirmed that this package contained over 3,047 grams of a mixture and substance containing fentanyl. C. Hammond and Haddou planned to retrieve this package sent by UCC-1 from Moore for further distribution by the defendant, C. Hammond, and Haddou.

9. Once the packages arrived in the Eastern District of Virginia, C. Hammond and/or his co-conspirators Haddou and Moore, and others known and unknown, retrieved the packages from the USPS, UPS, and/or from the addresses to which the C. Hammond and Haddou directed the packages be sent. All packages eventually went to the defendant, C. Hammond, and Haddou for redistribution. When Moore would receive and/or retrieve packages for C. Hammond and Haddou, they would compensate Moore with cocaine and marijuana.

10. During the course of the conspiracy, the co-conspirators utilized an address belonging to the defendant's mother for the receipt of a drug-laden package. Specifically, on January 21, 2023, a package containing controlled substances was shipped to an address in Sterling, VA belonging to the defendant's mother. Upon its arrival, the defendant notified C. Hammond, who retrieved the package. C. Hammond and the defendant subsequently distributed its contents.

11. On or about July 28, 2023, C. Hammond self-surrendered to begin a term of imprisonment stemming from a May 2022 arrest in Prince George's County, Maryland for gun and drug-related charges. Thereafter, the defendant planned to continue the enterprise with Haddou.

12. For example, in or around this time, the defendant directly coordinated with Mitchell regarding the shipment of a package containing 50,000 counterfeit pills containing fentanyl. At the defendant's direction, Mitchell shipped the package to co-conspirator Moore. The defendant personally retrieved the package from Moore after it arrived for further distribution.

13. Mitchell and Leyva periodically travelled to the Eastern District of Virginia to retrieve proceeds from their drug distribution from the defendant, C. Hammond, and Haddou. The defendant also transmitted proceeds via electronic means to sources of supply, including Mitchell and Leyva.

        *b.   Redistribution within the Eastern District of Virginia*

14. The defendant, C. Hammond, and Haddou had several redistributors, including an individual referred to herein as "UCC-2." C. Hammond was typically the primary point of contact for the redistributors during the conspiracy.

15. UCC-2 was another fentanyl dealer who distributed fentanyl and other drugs in the Eastern District of Virginia. From in or around the summer of 2022, through and including June 2023, C. Hammond sold fentanyl on an approximately weekly basis to UCC-2. UCC-2 purchased approximately 1,000-pill quantities of fentanyl at a time from C. Hammond, up to three times a month for numerous months. In total, C. Hammond, the defendant, and Haddou sold at least 17,000 pressed fentanyl pills to UCC-2. During this same period, UCC-2 also purchased cocaine from the defendant, C. Hammond, and Haddou. In total, the defendant, C. Hammond, and Haddou sold at least 21 grams of cocaine to UCC-2. The pills and cocaine that the defendant, C. Hammond, and Haddou sold to UCC-2 were supplied by co-conspirators Mitchell and Leyva. Haddou and the defendant often accompanied C. Hammond during these drug deals. The defendant and/or C. Hammond were typically armed with a firearm during these transactions. On one occasion, the defendant personally delivered counterfeit oxycodone pills to UCC-2 within the stairwell of her residence. The counterfeit pills were visible inside a translucent Ziplock bag that was contained within an open paper bag.

### c. *Search of the Defendant's Apartment*

16. On August 10, 2023, federal authorities executed a lawfully obtained search warrant at the defendant's apartment located in Alexandria, Virginia. The defendant shared this apartment with Haddou at the time. The search occurred approximately two weeks after C. Hammond had self-surrendered to serve a term of imprisonment in Maryland. During the search warrant, the following drugs were seized from the defendant's residence:

| Substance | Quantity (gross weight) |
|---|---|
| Fentanyl powder | 2.2 kg |
| Counterfeit pills containing fentanyl | 5.17 kg (approx. 50,000 pills) |
| Cocaine | 1.7 kg |
| Marijuana | 2.5 kg |

The majority of the counterfeit pills recovered from the defendant's residence also contained xylazine. The fentanyl powder, counterfeit pills, and cocaine found at the apartment had been sent via the mail to the defendant, C. Hammond, and Haddou by co-conspirators Mitchell and Leyva from Arizona.

### II. Firearms Trafficking and Straw Purchasing

17. Between in and around June 2022 through in and around August 2023, the defendant conspired with separately convicted co-conspirator C. Hammond to traffic in firearms. The objects of the conspiracy included to purchase and acquire firearms for both (1) the defendant to transfer to C. Hammond for him to possess firearms in furtherance of a drug-trafficking scheme in which the defendant was also engaged, and (2) the ability to resell firearms for a profit to others. At times, the defendant and C. Hammond advertised firearms that the defendant had already purchased and would sell them at prices higher than what the defendant had originally paid for the firearms. The defendant would also acquire weapons and ammunition that had been specifically requested by a

buyer and then resell the weapon to the buyer for a profit. Neither the defendant nor C. Hammond were licensed dealers of firearms within the meaning of Chapter 44, Title 18, United States Code. During the conspiracy, the defendant held a Virginia concealed carry permit that allowed her to purchase multiple firearms at a time.

18. In addition to trafficking in firearms, the defendant also kept some firearms for her own use in furtherance of the drug-trafficking conspiracy.

19. Throughout the conspiracy, C. Hammond had a prior conviction for a crime punishable by imprisonment for a term exceeding one year. Furthermore, throughout the firearms trafficking conspiracy, both the defendant and C. Hammond were together engaged in a drug trafficking conspiracy as charged in Count One of the criminal information. During the conspiracy, C. Hammond also had pending drug- and firearm-related charges in Prince George's County, Maryland stemming from a May 2022 arrest that occurred after firearms and drugs were found in a vehicle occupied by C. Hammond and the defendant. Nevertheless, the defendant transferred firearms to C. Hammond knowing and having reasonable cause to believe that his possession of a firearm would constitute a felony.

20. In furtherance of the firearm-trafficking conspiracy, the defendant purchased at least the following firearms from Trojan Arms & Tactical, a licensed dealer of firearms in Virginia:

    i. a Glock, Model 26 Gen 3, 9mm semi-automatic pistol, serial number BWHW480 from Trojan Arms & Tactical in Manassas, Virginia, on July 1, 2022;
    ii. a Smith & Wesson, Model M&P15-22, 22LR Rifle, Serial Number LBB8966, from Trojan Arms & Tactical in Manassas, Virginia, on July 1, 2022;
    iii. a Girsan, Model MC28 SA T, 9mm semi-automatic pistol, serial number T6368-20AV12452 from Trojan Arms & Tactical in Manassas, Virginia, on July 1, 2022;
    iv. a Taurus, Model GSC, 9mm semi-automatic pistol, serial number ADB993839, from Trojan Arms & Tactical in Manassas, Virginia, on July 1, 2022;

     v. a Glock, Model 29, 10mm semi-automatic pistol, serial number BXDM737 from Trojan Arms & Tactical in Manassas, Virginia, on July 1, 2022;

     vi. a Ruger, Model EC95, 9mm semi-automatic pistol bearing serial number 45987941, from H&F Arms LLC in Alexandria, Virginia, on July14, 2022; and

     vii. a CZ, Model Scorpion EVO 35, serial number F437700, 9mm semi-automatic pistol, from Trojan Arms & Tactical Inc., on July 26, 2022.

21. In addition to the firearms listed in paragraph 20, the defendant and C. Hammond procured additional firearms from other sources, and transferred them to individuals whose possession of them would constitute a felony:

     i. a Glock, Model 27, 40 caliber pistol, serial number BXAU295 that the defendant purchased from H & F Firearms in Alexandria, Virginia, on June 25, 2022. The defendant transferred that firearm to C. Hammond, knowing that his possession of the firearm would constitute a felony;

     ii. A Glock, Model 48, 9 mm pistol, serial number BRLE673, that C. Hammond sold to UCC-2 for $800 and that was thereafter recovered by law enforcement from UCC-2 on December 8, 2022;

     iii. An SCC, model CPX-1, .9 mm pistol, serial number C261103, that C. Hammond sold to UCC-2 for $500 and that was thereafter recovered by law enforcement from UCC-2 on February 28, 2023;

     iv. A Polymer80 pistol with no serial number that C. Hammond sold to UCC-2 for $900 on April 17, 2023.

The defendant was present for at least one of the firearm sales to UCC-2. The defendant knew and had reasonable cause to believe that the use, possession, or carrying of a firearm by UCC-2, a convicted felon, would constitute a felony.

22. On another occasion, the defendant handled and showed UCC-2 another firearme. UCC-2 did not buy it.

23. At the time of the gun sales to UCC-2, UCC-2 had previously been convicted of a crime punishable by imprisonment for a term exceeding one year, was an illegal alien, and was also a redistributor of controlled substances for C. Hammond and the defendant.

8

24. During the aforementioned time period, in furtherance of the conspiracy, the defendant and C. Hammond purchased and resold at least eight firearms knowing that the use, carrying or possession of a firearm by the recipient would constitute a felony.

25. The CZ Scorpion firearm described in paragraph 20 was purchased by the defendant for C. Hammond for his own use in furtherance of drug trafficking. Before its purchase, C. Hammond discussed a contemplated straw purchase by the defendant via text message with Moore, who was a co-conspirator in the defendant and C. Hammond's drug trafficking. Specifically, on June 5, 2022, C. Hammond told Moore that a firearm loaned to C. Hammond by Moore would be returned as soon as the defendant bought C. Hammond his own firearm. C. Hammond further indicated that the defendant would be able to purchase him a firearm beginning June 11, 2022. The CZ Scorpion is a semiautomatic firearm capable of accepting large capacity magazines.

26. The Glock Model 27 and CZ Scorpion firearms referenced in paragraph 20 were recovered from the defendant's residence on August 10, 2023, during the time of the arrest of three of the defendant's conspirators charged in Count One of the criminal information.

   i. At the time of its seizure, the CZ Scorpion was found with a drum magazine and one round loaded in the chamber. The firearm was located in the bedroom closet of co-conspirator Mohamed Haddou within arm's length of a duffle bag containing thousands of counterfeit pills containing fentanyl and within arm's length of a locked safe containing a bulk quantity of counterfeit pills containing fentanyl and two kilograms of fentanyl power.

   ii. At the time of its seizure, the Glock 27 semiautomatic pistol was located under the cushion of a couch in the defendant's living room on which co-conspirator Mitchell had been sleeping. At the time of its seizure, the firearm was equipped with a 15-round magazine loaded with 12 rounds of ammunition as well as a 29-round magazine loaded with 23 rounds of ammunition.

27. Further, on June 15, 2022, the defendant purchased 100 rounds of ammunition for a Taurus pistol, when the true buyer of the ammunition was an uncharged co-conspirator of the

defendant, "UCC-3." The defendant arranged the transaction in advance via text message. The defendant was paid a profit for buying the ammunition. UCC-3 was also a redistributor of controlled substances supplied by the defendant and C. Hammond.

28. At least two of the firearms trafficked by the defendant described in paragraph 20 above were later recovered in connection with criminal activity or from individuals prohibited from possessing the firearms.

29. For example, the Girsan semi-automatic pistol referenced in paragraph 20 was recovered just 10 days after it was purchased by the defendant in a domestic violence kidnapping incident. Specifically, on July 11, 2022, Fairfax County police officers responded to a domestic violence call. The caller indicated that the father of her children—whom she had not been in a relationship with for several years—came to her home, pushed her to the ground, threatened her with a gun, and stated that he would kill her and her family if she did not take him back. The caller had tried multiple ways to leave her home and escape the possessor of the Girsan pistol, but she was prevented from doing so.

30. As another example, the Glock Model 26 semi-automatic pistol referenced in paragraph 20 was recovered 558 days after it was purchased by the defendant in the possession of a convicted felon. Specifically, on January 10, 2024, following the arrest of a drug trafficker in Oxon Hill, Maryland, law enforcement searched his residence and seized the following, among other items:

    i. the Glock 26 purchased by the defendant, which at the time was equipped with an extended magazine and twelve rounds of 9mm ammunition in the chamber;
    ii. a black rifle, which at the time was equipped with a loaded magazine containing 33 rounds of ammunition, as well as a round of ammunition in the chamber;
    iii. additional quantities of ammunition
    iv. A clear plastic bag containing approximately 5.91 grams of powder fentanyl; and

      v. A clear bag containing approximately 10.78 grams of cocaine.

31. Additional firearms were recovered no longer in the possession of the defendant. For example, the Glock Model 29 semi-automatic pistol referenced in paragraph 20 was recovered 189 days after it was purchased by the defendant, having been abandoned in public. Specifically, on or about January 6, 2023, Fairfax County Police responded to a billiards club in Annandale, Virginia where the firearm had been found in the garbage can of the women's bathroom and was loaded when found. The Glock 29 had a 15-round magazine and was loaded with 15 rounds in total when found.

32. None of the firearms that the defendant sold or illegally transferred to C. Hammond were manufactured in the Commonwealth of Virginia. The firearms were imported to and sold in the Commonwealth of Virginia and, therefore, traveled in interstate commerce.

### III. Obstruction of Justice

33. In addition, in and around November 2023, in the Eastern District of Virginia, the defendant willfully used intimidation and corruptly persuaded another person ("W-1"), or attempted to do so, with the intent to influence, delay, or prevent the testimony of W-1 and/or one of the defendant's co-conspirators ("CC-1") in law enforcement's investigation of the defendant and her co-conspirators.

34. After C. Hammond was transferred via federal writ to the Alexandria Adult Detention Center on the then-pending charges in relation to the instant drug-trafficking conspiracy, the defendant maintained regular contact with him.

35. In or around September 2023, the defendant contacted W-1 regarding the federal investigation and pending cases. W-1 had a close, personal relationship with CC-1,[1] who had

---

1 CC-1 is referred to anonymously in relation to the obstruction allegation described herein, regardless of whether CC-1 is referred to by name elsewhere in the Statement of Facts.

11

pending federal charges at the time. W-1 informed the defendant that CC-1 was not allowed to speak to the defendant and W-1 requested that the defendant no longer contact W-1.

36. On or about November 16, 2023, the defendant called W-1 again regarding the investigation and pending cases. During that phone call, the defendant expressed her belief that CC-1 was cooperating with federal authorities and instructed W-1 to tell CC-1 to "keep my name out of his mouth." W-1 conveyed the defendant's statement to CC-1. Both CC-1 and W-1 understood the defendant to be demanding that W-1 and CC-1 not reveal to law enforcement information regarding her and C. Hammond's participation in the offenses under investigation.

37. As a result of the November 16, 2023 phone call, W-1 was, in fact, intimidated and threatened by the defendant's statements.

***

38. This statement of facts includes those facts necessary to support the plea agreement between the defendant and the United States. It does not include each and every fact known to the defendant or to the United States, and it is not intended to be a full enumeration of all of the facts surrounding the defendant's case.

39. The actions of the defendant, as recounted above, were in all respects knowing and deliberate, and were not committed by mistake, accident, or other innocent reason.

40. If the defendant breaches the plea agreement, then pursuant to the plea agreement, he waives any rights under Federal Rule of Criminal Procedure 11(f), Federal Rule of Evidence 410, the United States Constitution, and any federal statute or rule in objecting to the admissibility of the statement of facts in any such proceeding.

                                             Respectfully submitted,

                                             Jessica D. Aber
                                             United States Attorney

Date:   April 19, 2024                 By: *[signature]*
                                             Kristin S. Starr
                                             Heather D. Call
                                             Assistant United States Attorneys

After consulting with my attorney and pursuant to the plea agreement entered into this day between the defendant, KAITLYN MARIE HAMMOND, and the United States, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

_____
KAITLYN MARIE HAMMOND

I am John Iweanoge, defendant's attorney. I have carefully reviewed the above Statement of Facts with her. To my knowledge, her decision to stipulate to these facts is an informed and voluntary one.

_____
John Iweanoge, II
Attorney for Kaitlyn Marie Hammond

14