IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>KAITLYN MARIE HAMMOND,<br><br>*Defendant*. | Case No. 1:24-CR-86<br><br>The Honorable Leonie M. Brinkema<br><br>Hearing: July 9, 2024 |

**POSITION OF THE UNITED STATES WITH RESPECT TO SENTENCING**

The defendant Kaitlyn Marie Hammond conspired with numerous others to distribute thousands of fentanyl-laced pills, many laced with xylazine, masquerading as legitimate pharmaceuticals to individuals in the Eastern District of Virginia (EDVA). These pills pose a significant danger to the community because of the increased risk of addiction and overdose from fentanyl. Further, the defendant posed an additional danger in this case by engaging in witness tampering. After several co-conspirators were arrested in August 2023, the defendant called a co-conspirator's partner warning them not to talk to authorities about the defendant or the defendant's husband, Carrington Hammond ("C. Hammond").

In addition to her drug trafficking, the defendant engaged in widespread firearms trafficking. The defendant purchased seven firearms from a Virginia gun store to give to C. Hammond, a convicted felon, and the defendant further procured another four firearms from other sources and transferred them to C. Hammond as well as other prohibited individuals. The defendant and C. Hammond purchased and resold at least *eight* firearms to prohibited persons. These firearms not only ended up in the hands of other felons, but in two circumstances were

1

recovered from crime scenes, one in the hands of a domestic abuser a mere 10 days after the defendant's purchase of the gun.

To adequately reflect the seriousness of the offenses, protect the public, and deter the defendant and others from peddling counterfeit pills and firearms to prohibited persons, while taking into account the defendant's circumstances and the sentences of the defendant's co-conspirators, the government submits that the Court impose a sentence, with a downward departure from the guidelines of 210–262 months, of 180-months incarceration and a five-year period of supervised release.

## BACKGROUND

### I.     The Conspiracy to Distribute Fentanyl-Laced Counterfeit Pills

The defendant conspired with other individuals to distribute fentanyl—in the form of pressed "M30," or "Perks" (*i.e.*, counterfeit oxycodone pills containing fentanyl)—in the Eastern District of Virginia.    ECF No. 55, Presentence Investigation Report (hereinafter, "PSIR") at 8–9. The defendant worked closely with her husband, C. Hammond, and Mohamed Haddou ("Haddou"), even sharing a residence, throughout this drug distribution conspiracy to obtain controlled substances for distribution and share the profits of their joint distribution.    In addition to distributing kilogram quantities of fentanyl, the defendant, C. Hammond, and Haddou also distributed cocaine and other controlled substances.    *Id.*

The defendant and her co-conspirators obtained pressed fentanyl pills from their suppliers, Aaron Alex Mitchell ("Mitchell") and Iram Leyva ("Leyva"), based in Arizona.    PSIR at 8.    Once the C. Hammond placed an order for drugs, Mitchell and Leyva packaged and shipped fentanyl pills, as well as cocaine and powdered fentanyl, within parcels from Arizona through the mail (*i.e.*,

2

United States Postal Service or "USPS"), or through package delivery services, such as UPS, to the defendant and/or her co-conspirators in Virginia. *Id.* at 8–9.

During the federal investigation into the defendant's drug trafficking, law enforcement identified at least 19 such packages mailed by Mitchell and Leyva to the defendant and her co-conspirators in the Eastern District of Virginia. PSIR at 9. On average, Mitchell and Leyva mailed packages containing 10,000–20,000 counterfeit pills and 1–2 kilograms of cocaine to the defendant, C. Hammond, and Haddou one to two times per month. On at least one occasion in late July 2023, after C. Hammond's incarceration, the quantity exceeded these amounts with Mitchell shipping a package containing 50,000 pills to the defendant and Haddou. *Id.*

Once the packages arrived in Virginia, the defendant and/or her co-conspirators Haddou and Ja'Qua Moore ("Moore"), and others known and unknown, retrieved the packages from the USPS, UPS, and/or from the addresses to which C. Hammond and Haddou directed the packages be sent. PSIR at 9. In fact, on January 21, 2023, the co-conspirators used an address belonging to the defendant's mother for the receipt of a drug-laden package. *Id.* Once the package arrived at the defendant's mother's house in Sterling, Virginia, the defendant notified C. Hammond, who retrieved the package. C. Hammond and the defendant subsequently distributed its contents. *Id.* All packages eventually went to the defendant, C. Hammond, and Haddou for redistribution. When Moore would receive and/or retrieve packages for the defendant, C. Hammond, and Haddou, they would compensate Moore with cocaine and marijuana. *Id.*

3

## II. Redistribution within the Eastern District of Virginia

The defendant, C. Hammond, and Haddou had several redistributors for the drugs, including an individual referred to herein as "UCC-2." PSIR at 10. C. Hammond was typically the primary point of contact for the redistributors during the conspiracy. *Id.*

UCC-2 was another fentanyl dealer who distributed fentanyl and other drugs in the EDVA. PSIR at 10. From the summer of 2022, through and including June 2023, C. Hammond sold fentanyl on an approximately weekly basis to UCC-2. *Id.* UCC-2 purchased approximately 1,000-pill quantities of fentanyl at a time from C. Hammond, up to three times a month for numerous months. In total, C. Hammond, the defendant, and Haddou sold at least 17,000 pressed fentanyl pills to UCC-2. *Id.* During this same period, UCC-2 also purchased cocaine from the defendant, C. Hammond, and Haddou on several occasions, totaling at least 21 grams of cocaine. *Id.* at 10–11. Mitchell and Leyva supplied the pills and cocaine that the defendant, C. Hammond, and Haddou sold to UCC-2. *Id.* The defendant and/or C. Hammond were typically armed with a firearm during these transactions. On one occasion, the defendant personally delivered counterfeit oxycodone pills to UCC-2 within the stairwell of her residence. The counterfeit pills were visible inside a translucent Ziplock bag that was contained within an open paper bag. *Id.*

## III. The Search of the Defendant's Apartment

On August 10, 2023, federal authorities executed a search warrant at the defendant and Haddou's apartment located in Alexandria, Virginia. PSIR at 10–11. The defendant and Haddou shared this apartment with C. Hammond until C. Hammond self-surrendered 12 days earlier on July 28, 2023 to serve a state term of imprisonment. *Id.* at 10. During the search warrant, law enforcement seized the following drugs from the shared residence of the defendant:

4

| Substance | Quantity (gross weight) |
|---|---|
| Fentanyl powder | 2.2 kg |
| Counterfeit pills containing fentanyl | 5.17 kg (approx. 50,000 pills) |
| Cocaine | 1.7 kg |
| Marijuana | 2.5 kg |

*Id.* Most of the fentanyl pills recovered from the defendant's residence also contained xylazine. *Id.* at 11. Mitchell and Leyva sent the fentanyl powder, counterfeit pills, and cocaine found at the apartment via mail to the defendant, C. Hammond, and Haddou, from Arizona. *Id.* The defendant, along with Haddou, intended to maintain the drug distribution business during C. Hammond's incarceration.

**IV.  Firearms Trafficking and Straw Purchasing**

Between in and around June 2022 through in and around August 2023, the defendant conspired with separately convicted co-conspirator C. Hammond to traffic in firearms. PSIR at 11. The objects of the conspiracy included to purchase and acquire firearms for both (1) the defendant to transfer to C. Hammond for him to possess firearms in furtherance of a drug-trafficking scheme in which the defendant was also engaged, and (2) the ability to resell firearms for a profit to others. *Id.* At times, the defendant and C. Hammond advertised firearms that the defendant had already purchased and would sell them at prices higher than what the defendant had originally paid for the firearms. *Id.* The defendant would also acquire weapons and ammunition that had been specifically requested by a buyer and then resell the weapon to the buyer for a profit. *Id.* Neither the defendant nor C. Hammond were licensed dealers of firearms. *Id.*

In addition to trafficking in firearms, the defendant also kept some firearms for her own use in furtherance of the drug-trafficking conspiracy. PSIR at 11.

Throughout the conspiracy, C. Hammond had a prior conviction. PSIR at 11. And, further, throughout the firearms trafficking conspiracy, both the defendant and C. Hammond were together engaged in a drug trafficking conspiracy. *Id.* During the conspiracy, C. Hammond also had pending drug- and firearm-related charges in Prince George's County, Maryland stemming from a May 2022 arrest that occurred after firearms and drugs were found in a vehicle occupied by C. Hammond and the defendant. *Id.* Nevertheless, the defendant transferred firearms to C. Hammond knowing and having reasonable cause to believe that his possession of a firearm would constitute a felony. *Id.*

As recounted in detail in the Statement of Facts, Dkt. 50, the defendant purchased at least seven firearms from a licensed firearm dealer in Virginia, including six semi-automatic pistols—one, the CZ Scorpion EVO 35, a tactical assault weapon—and one rifle, in furtherance of the firearm-trafficking conspiracy. PSIR at 11–12. In fact, on August 10, 2023, during the search of the defendant's residence, law enforcement found the CZ Scorpion in Haddou's closet within arm's length of a duffle bag containing thousands of fentanyl pills and a locked safe containing a bulk quantity of counterfeit pills containing fentanyl and two kilograms of fentanyl power. *Id.* at 13. At the time of its seizure, the CZ Scorpion was outfitted with a drum magazine and had one round loaded in the chamber of the gun. *Id.*

Three of the four other guns that the defendant obtained from different sources were sold by C. Hammond and the defendant to UCC-2, a convicted felon, including a Polymer80 pistol with no serial number—known as a "ghost gun." PSIR at 12. The defendant also sold 100

6

rounds of ammunition for a profit to UCC-3, another uncharged co-conspirator who was also a redistributor of controlled substances supplied by the defendant and C. Hammond. *Id.* at 13.

Further aggravating, the defendant trafficked two firearms that were later recovered in connection with criminal activity or from individuals prohibited from possessing the firearms. PSIR at 13. For example, the Girsan semi-automatic pistol that the defendant purchased from a firearms dealer in Virginia was recovered just 10 days after it was purchased by the defendant in a domestic violence kidnapping incident. *Id.* at 13–14. Specifically, on July 11, 2022, Fairfax County police officers responded to a domestic violence call. The caller indicated that the father of her children—whom she had not been in a relationship with for several years—came to her home, pushed her to the ground, threatened her with a gun, and stated that he would kill her and her family if she did not take him back. The caller had tried multiple ways to escape the possessor of the Girsan pistol, but she was prevented from doing so. *Id.* at 14.

As another example, the Glock Model 26 semi-automatic pistol that the defendant purchased from a firearms dealer in Virginia was recovered 558 days after it was purchased by the defendant in the possession of a convicted felon. PSIR at 14. Specifically, on January 10, 2024, following the arrest of a drug trafficker in Oxon Hill, Maryland, law enforcement searched his residence and seized the following, among other items: the Glock 26 purchased by the defendant, equipped with an extended magazine and 12 rounds of ammunition in the chamber; a black rifle loaded with 33 rounds of ammunition; a clear plastic bag containing approximately 5.91 grams of fentanyl powder; and a clear bag containing approximately 10.78 grams of cocaine. *Id.* at 14.

Finally, a third firearm, a Glock Model 29 semi-automatic pistol that the defendant bought from a firearms dealer in Virginia, was found loaded and discarded in a public restroom trashcan of a billiards club in Annadale, Virginia on January 6, 2023.  PSIR at 14.

## V.    Obstruction of Justice

In addition, around November 2023, the defendant willfully used intimidation and corruptly persuaded another person ("W-1"), or attempted to do so, with the intent to influence, delay, or prevent the testimony of W-1 and/or one of the defendant's co-conspirators ("CC-1") in law enforcement's investigation of the defendant and her co-conspirators.  PSIR at 14–15.

On November 16, 2023, the defendant called W-1 regarding the then-pending federal charges in this case.  PSIR at 15.  During that phone call, the defendant expressed her belief that CC-1 was cooperating with federal authorities and instructed W-1 to tell CC-1 to "keep my name out of his mouth."  *Id.*  W-1 conveyed the defendant's statement to CC-1.  *Id.*  Both CC-1 and W-1 understood the defendant to be demanding that W-1 and CC-1 not reveal to law enforcement information regarding the defendant and C. Hammond's participation in the offenses under investigation.  *Id.*  As a result of the phone call, W-1 was, in fact, intimidated and threatened by the defendant's statements.  *Id.*

## VI.   Criminal Information and Plea Agreement

Pursuant to a plea agreement, *see* ECF No. 49, on April 24, 2024, the defendant pleaded guilty to a two-count Criminal Information charging her with: (1) conspiracy to distribute 400 grams of more of fentanyl, in violation of 21 U.S.C. §§ 841(a)(1), 846; and (2) conspiracy to traffic firearms, in violation of 18 U.S.C. § 933(a)(3).  ECF Nos. 46 (Criminal Information), 48 (Minute Order).

## VII. The Defendant's Criminal History

The defendant has a scant criminal history, which is reflected by the fact that she is a criminal history category I, with a criminal history score of 0. PSIR at 17–19.

## ANALYSIS

### I. Legal Standard

The standards governing sentencing are well established. This Court must consult the United States Sentencing Guidelines ("U.S.S.G." or "Sentencing Guidelines") as well as the factors set for in 18 U.S.C. § 3553(a) when making a sentencing decision, though the Sentencing Guidelines are purely advisory. *See United States v. Booker*, 543 U.S. 220 (2005). The Supreme Court has directed district courts to "begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Gall v. United States*, 552 U.S. 38, 49 (2007). "Then, the court shall consider that range as well as other relevant factors set forth in the guidelines and those factors set forth in [18 U.S.C.] § 3553(a) before imposing the sentence." *United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005).

Pursuant to 18 U.S.C. § 3553(a), the Court should consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to, among other things, reflect the seriousness of the offense and adequately deter criminal conduct; (3) the kinds of sentences available; (4) the Sentencing Guidelines; (5) policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records found guilty of similar conduct; and (7) the need to provide restitution to victims of the offense. Ultimately, the sentence imposed must meet a standard of reasonableness. *See Booker*, 543 U.S. at 260–61.

## II. Sentencing Guidelines and Downward Departure

The parties and probation agree that the following guidelines apply to both counts due to grouping.  *See* Plea Agreement, ECF No. 49 at 3; PSIR at 16–17.

| Guideline(s) | Description | Offense Level |
|---|---|---|
| 2D1.1(c)(2) | Drug quantity | 36 |
| 3C1.1 | Obstructing or Impeding the Administration of Justice | +2 |
| **Total Offense Level** | | **38** |

Probation further found that a two-level enhancement is appropriate under USSG § 2D1.1(b)(1) as the defendant possessed a firearm in connection with her drug trafficking.  PSIR at 17.  This brings the defendant's adjusted offense level to a 40.  *Id.*

The United States, in accordance with the plea agreement, further hereby moves for a third point reduction due to the defendant's acceptance of responsibility.  This gives the defendant a total offense level of 37.  PSIR at 17.  When a total offense level of 37 is applied to the defendant who, as described above, has a Criminal History Category of I, the guidelines range for the grouped counts is 210 to 262 months of imprisonment.  PSIR at 25.

The United States seeks a downward departure from the guidelines range of 210–262 months imprisonment and requests a sentence of 180-months imprisonment.

## III. Statutory Analysis and Recommendation

### A. *Nature and Circumstances of the Offenses.*

The nature and circumstance of the defendant's offenses warrant a serious and lengthy sentence applicable to a drug distribution scheme and firearms trafficking conspiracy as deadly and large-scale as that of the defendant.  *See* 18 U.S.C. § 3553(a)(1).  The defendant pleaded guilty to a conspiracy to distribute 400 grams or more of fentanyl.  ECF No. 49.  Starting in

December 2022, the defendant, C. Hammond, and Haddou began purchasing and selling pressed fentanyl pills, first ordering 17,000 fentanyl-laced pills. Only three months later, the defendant, C. Hammond, and Haddou were purchasing 20,000 to 40,000 counterfeit pills each month—along with kilograms of cocaine and powdered fentanyl—for redistribution. To say this conspiracy distributed "large quantities" of these fentanyl pills is an understatement.

"Fentanyl is an extremely addictive and dangerous narcotic, which leads to tens of thousands of overdose deaths in the United States each year." *United States v. Santos*, 2023 WL 34822, at *2 (S.D.N.Y. Jan. 4, 2023) (denying a motion for compassionate release). "The CDC reports that '[o]ver 150 people die every day from overdoses related to synthetic opioids like fentanyl,' which is up to 50 times stronger than heroin and 100 times stronger than morphine." *United States v. Gonzalez*, 2022 WL 16919842, at *6 (S.D.N.Y. Nov. 14, 2022) (citing Fentanyl Facts, Ctrs. for Disease Control & Prevention, cdc.gov/stopoverdose/fentanyl/index.html (last accessed Nov. 14, 2022)) (denying a motion for compassionate release). Unfortunately, this Commonwealth has not been spared of the deadliness of the national epidemic. Illicit fentanyl like that peddled by the defendant has been the driving force behind the large increases in fatal overdoses in Virginia—making fatal drug overdoses the leading method of unnatural death—since 2013. Virginia Department of Health, *Fatal Drug Overdose Quarterly Report* (3rd Quarter 2023), *available at* https://www.vdh.virginia.gov/content/uploads/sites/18/2024/01/Quarterly-Drug-Death-Report-FINAL-Q3-2023.pdf. In Virginia, fentanyl was involved in 75.9% of all 1,986 drug overdose deaths in 2022—which works out to over five Virginians per day. *Id.* In sum, "[f]entanyl distribution poses a grave danger to the community." *United States v. Mitchell*, 2023 WL

11

5438156, at *3 (E.D. Va. Aug. 23, 2023) (citing *United States v. Texeira-Spencer*, 2021 WL 1535309, at *4 (D.D.C. Apr. 19, 2021)).

Moreover, the types of counterfeit pills that the defendant sold pose a particular danger. The pressed "M30s" or "Perks" are counterfeit oxycodone pills containing fentanyl. These pills bear the same markings (an "M" and a "30") and same color as prescription oxycodone. But instead of containing the active pharmaceutical ingredient in oxycodone, the pills that the defendant distributed contained fentanyl. In fact, most of the pills found in the defendant's residence in August 2023 not only contained fentanyl, but xylazine—a substance which is not approved for use in human beings and can slow down the brain and breathing, make the heart beat slower, and lower blood pressure in people—an especially dangerous combination.

The Sentencing Commission was concerned about these types of counterfeit pills and sought to address the associated dangers by including a four-point enhancement to the sentencing guidelines. U.S.S.G. App. C, amendment 807 (Reason for Amendment) (2018) ("Because of fentanyl's extreme potency, the risk of overdose death is great, particularly when the user is inexperienced or unaware of what substance he or she is using."). While the defendant's customers were apparently aware that the pills she peddled contained fentanyl (and thus the four-point enhancement does not apply), the Court should consider the danger of these counterfeit pills to their ultimate end-users and the objectives of the Sentencing Commission, when issuing the defendant's sentence.

Further, the Court should take very seriously the fact that the defendant thought it appropriate to intimidate a witness in this case in attempt to save herself from being implicated and charged in this drug conspiracy. This behavior simply cannot be tolerated, and it is

imperative that the Court send a strong message of deterrence to this defendant and all those who may consider acting in the same manner.

In addition to the dangerousness of the fentanyl she was distributing and her witness intimidation, the defendant trafficked a large number of firearms that ended up in the hands of convicted felons, drug traffickers, and even a domestic abuser. The defendant obtained her concealed carry permit so she could purchase more weapons. The defendant then purchased numerous semi-automatic weapons and even an assault weapon, arming her convicted felon husband and herself through their drug trafficking. The guns were also resold for a profit by the defendant and C. Hammond, with knowledge that those weapons were going to other convicted felons or persons otherwise prohibited from possessing firearms. That a weapon the defendant purchased ended up in a crime scene where a woman could have been killed with the defendant's firearm a mere 10 days after the defendant's purchase shows the defendant's immense disregard for the danger she was injecting into the community by her firearms trafficking and resale of guns to prohibited persons.

In fact, the defendant and C. Hammond even combined their two criminal pursuits: selling pills and cocaine *along with* firearms to UCC-2 another Virginia-based dealer and addict. That redistributor was apprehended by local police multiple times passed out in public places, including on a bench outside a local grocery store, carrying the firearms and deadly fentanyl pills that the defendant sold him. One of the firearms that the defendant sold, through C. Hammond, to UCC-2, a Polymer80 pistol, was a "ghost gun"—a firearm without a serial number so that it cannot be traced. The defendant further carried a firearm during her drug trafficking for protection of herself, her co-conspirators, the drugs, and the drug proceeds. And once the

13

defendant's husband had pending gun charges in Maryland or was otherwise forbidden from carrying a firearm himself, the defendant not only carried but purchased firearms for him.

A sentence of imprisonment of 180 months adequately reflects the nature and circumstances of the offenses, including the dangerousness of the counterfeit pills the defendant distributed and the reckless way she carried and sold weapons as part of her drug distribution *and* as part of an additional, separate firearms trafficking conspiracy. This sentence will also reflect the seriousness of the offense—and the seriousness of the danger the defendant posed to herself and others—and will promote respect for the law and provide just punishment. *See* 18 U.S.C. §§ (a)(1), (A)(2)(A).

**B.** *History and Characteristics of the Defendant and the Need for Adequate Deterrence.*

As stated, the defendant has a criminal history score of 0, putting her in a criminal history category of I. PSIR at 19.

The PSIR details a difficult childhood for the defendant due to a variety of factors that the United States will refrain from recounting publicly. PSIR at 19–24. And the strain from her relationship with her separated parents as well as traumatic events appear to be linked to the defendant's behavioral issues, substance abuse and, in turn, decisions to engage in criminal activity. *Id.*

It is worth noting; however, that the current conduct may not be an anomaly for the defendant. While nolle prossed, the defendant was charged in June 2021 with possession of a semi- or automatic weapon by a prohibited person and controlled substance, carrying a concealed deadly weapon, and possession of marijuana. PSIR at 19. Clearly the instant offenses represent a concerning escalation of criminal activity and a pattern of carrying firearms in connection with

14

controlled substances.

While the Court should consider the defendant's background and lack of significant criminal history as mitigating factors against a term of imprisonment within the guidelines range, the sentence must also reflect the defendant's very serious and extensive criminal activity and the need for deterrence for the defendant. Additionally, the Court must ensure that the sentence adequately protects the public from further crimes of the defendant. 18 U.S.C. §§ 3553(a)(1), (a)(2)(C). The government submits that a sentence of 180-months imprisonment adequately balances the aforementioned factors.

### C. *The Need to Avoid Unwanted Disparities.*

The Court's starting place for the imposition of the defendant's sentence should be the guideline range of 210 to 262 months as discussed above. By starting with the guideline range, "the district court necessarily g[ives] significant weight and consideration to the need to avoid unwarranted disparities." *United States v. Sueiro*, 59 F.4th 132, 141–42 (4th Cir. 2023) (citing *Gall*, 552 U.S. at 54) (quotations omitted). "The requirement of procedural reasonableness does not obligate a trial court to engage in case-by-case comparisons of sentences imposed in cases unconnected to the case before the court." *Id.* at 142. By starting with the guideline range, the Court will adequately consider the need to avoid unwanted sentencing disparities. *See* 18 U.S.C. § 3553(a)(6).

On February 13, 2023, co-conspirator C. Hammond was sentenced to 180 months, comprised of 120 months on the conspiracy to distribute 400 grams or more of a mixture and substance continuing fentanyl, in violation of 21 U.S.C. §§ 841(a) and 846; and 60 months on the use of a firearm in connection with a drug trafficking offense, in violation of 18 U.S.C. § 924(c).

1:23-CR-166, Dkt. 55.

On February 20, 2024, co-conspirator Aaron Mitchell was sentenced to 168 months' imprisonment for his role in the conspiracy to distribute 400 grams or more of a mixture and substance continuing fentanyl, in violation of 21 U.S.C. §§ 841(a) and 846.  1:23-CR-175, Dkt. 58.  Then, on June 11, 2024, co-defendant Iram Leyva was sentenced to 180 months' imprisonment for his role in the fentanyl trafficking conspiracy within EDVA and beyond.  1:24-CR-45, Dkt. 62.

Of further relevance, co-conspirator Mohamed Haddou was sentenced on February 20, 2024 to 120 months' imprisonment on one count of conspiring to distribute 400 grams or more of fentanyl.  1:23-CR-169, Dkt. 59.  While Haddou played a very similar role in the drug trafficking conspiracy as the role of the defendant, there are two key differences from Haddou that necessitate a longer term of imprisonment for this defendant.

First, the defendant was involved in witness tampering when authorities were attempting to further investigate the drug trafficking conspiracy and the roles of the various co-conspirators. There were no such attempts by Haddou to threaten other witnesses from talking with law enforcement.  Second, and most notably, the defendant was involved in an *additional* conspiracy, for which Haddou did not play a role.  The defendant purchased and obtained numerous firearms all with the intent of providing them to convicted felons or individuals who were otherwise prohibited from having such weapons, and some of those guns even ended up in crime scenes. This immensely serious conduct must be punished appropriately and severely.

As a result, the government submits that there would be disparity to fashion a guidelines sentence of 210–262 months imprisonment, but that there would be no disparity in the court

16

issuing a sentence of 180 months for this defendant who engaged in drug trafficking, obstructing justice, *and* firearms trafficking.

   D. *Forfeiture.*

A consent order of forfeiture will be submitted at the time of the hearing.

## CONCLUSION

For the foregoing reasons, the United States respectfully recommends that the Court impose a term of imprisonment below the guidelines range of 180 months, and a five-year term of supervised release, with the special conditions of supervised release listed in the PSIR.

Respectfully submitted,

Jessica D. Aber
Date: July 3, 2024                United States Attorney

By:      /s/
Kristin S. Starr
Assistant United States Attorney

## **CERTIFICATE OF SERVICE**

      I hereby certify that on July 3, 2024, I caused a copy of the foregoing memorandum to befiled with the Clerk of Court using the CM/ECF system, which will automatically generate a Notice of Electronic Filing (NEF) to all counsel of record.

                                        */s/ Kristin S. Starr*
                                  Kristin S. Starr
                                  Assistant United States Attorney